Good morning, Your Honors. My name is Karen Buker. I represent Martin Frias, and this case is the Internet Chat case. Mr. Frias is entitled to a new trial because the record shows that the jury's verdict was influenced by evidence that was not in the record. The only issue that was- Try to get closer to the microphone, if you don't mind. The only issue in dispute in this case is whether- I'll start over, Your Honor. My name is Karen Buker. I represent Martin Frias, and this is the Internet Chat case. Mr. Frias is entitled to a new trial because the record shows that the jury's verdict was influenced by matters outside of the record. And the only issue in dispute in this case is whether or not Mr. Frias knew that the person he was dealing with, whether or not it was an adult or a 13-year-old girl. Okay. So what – when did the evidence outside the record – I assume you're talking about the prosecutor's closing argument? Yes, Your Honor. Did anybody object to the prosecutor's closing argument? No, Your Honor. There was no objection. So our review is for plain error? Yes, it's review for plain error. The error was plain because the defendant has the right to be convicted only on evidence developed at trial. And also, this was a very close case. Apparently, the jury was considering his defense. Apparently, they found it credible. So the only issue in this case was the credibility determination of Mr. Frias. Did he tell the police something different than he was telling on the stand? Not just the fact that he said – told the police I was not – I didn't think I was talking to an adult woman, but everything else he said on the stand. So why isn't a prosecutor in his closing argument entitled to say, I submit to you, ladies and gentlemen of the jury, that his testimony is – was not correct, that it was a lie? Because that was limited just to his comment or his testimony that he told the police, I did not think she was an adult woman. What happened was, in this case, the jury understood the prosecutor's comment to be expand – expand to his entire testimony. That is why they – How do we know that? Because of the jury notes. The jury submitted two notes, and they wanted to find out, to read – they wanted to read the arrest report to find out what exactly did he tell the police. I want to compare what he testified at trial to what he told the police. And that's when the error occurred. The jury – a message was conveyed to the jury that the prosecutor knew that the defendant said other things to the police that contradict his testimony, and that's where the problem occurred. Then the jury asked what was in the record about what he said to the police, and I assume the trial judge directed them to the appropriate place? Well, what happened is the jury first asked, can we review the after-arrest report, I guess meaning the police report, in relation to comments made by the defendant and presented by the prosecutor? And what did the trial judge do? It's hearsay. I can't give it to you. No. Right. It wasn't admitted. It's hearsay. Don't worry about it. You can't use it. Then, okay. Then the next day, the jury appeared to be frustrated, and they wrote another note, and they said they wanted to clarify the discrepancy, and they underlined that word twice, admitted several times by the government that the defendant lied to the FBI. So they believed that there was some information out there that the prosecutor knew that the defendant – What did the judge tell them the second time? That the lawyer's argument is not evidence. And given those things and the absence of objection, how can we find plain error? Well, in a case, U.S. v. Ferns, it's a Seventh Circuit case. It was somewhat similar, and the government had conveyed the idea that it had knowledge outside of the record, and there's nothing that the court could do to eradicate that because they already know or already have a feeling that there's knowledge out there that was not presented before them. And it's a Ninth Circuit case, U.S. v. Weatherspoon, and it says, failure to correct the improper statements at the time they were made cannot be later established by the later generalized jury instruction reminding In those cases, was there a contemporaneous objection? I believe that there was an objection in Weatherspoon. But the other day I thought of another issue. You know, the whole point of an objection is to give the court an opportunity to fix the record. And here the court did through the jury note. The jury kind of raised that issue. The prosecutor is making these statements that it's not in the record, and so the court tried to correct it by saying there's you cannot rely on. Well, juries ask all kinds of questions. Right. But this shows that they were relying on those statements, that they believed what the prosecutor was saying. We don't know that. We don't know what they were thinking. I think it's quite clear, especially on jury note number five, when it says they wanted to see the arrest report to clarify the discrepancy that the defendant submitted several times by the government that the defendant lied. I think what they wanted to do was to take his whole testimony and then compare it to what he said to the police, because the prosecutor said he lied about everything. And his story or his testimony seemed to be credible to the jury at first. That's what it appeared to be. What did he tell the police when he was arrested, when they first interviewed him? He told them that I didn't tell them that she was an adult woman, but what he said was you really don't know how old somebody is. That's what came out on the record during strict testimony. Well, let me go back. What did he tell them at the time he was they interviewed him? Oh, I don't know. I don't. The only thing that is in the record through his testimony, he said I just told him you never know how old somebody is. Right. So when he testified, what he said was he told the police, you know, I didn't know how old she was. Right? Or you never know how old somebody is. You never know, which essentially I didn't know. And the prosecutor said in light of all this evidence, jury, you shouldn't believe that. There's lots of evidence to the contrary. And I submit to you, the prosecutor says, when he said that to you, he wasn't telling the truth. What's wrong with that? Well, what's wrong with it is how the jury interpreted it through its jury. The bottom line is the jury believed that the prosecutor knew that the defendant made other statements to the police that contradicted his entire testimony. The fact that he went up there to Santa Monica just to check her out to see whether or not she was attractive, whether or not he really believed it was a woman's voice when he spoke to her over the phone. It was all that testimony. I think that they were trying to find out whether or not he was truthful to the police. The jury already knew that he didn't tell the police that I thought she was an adult woman. They already knew that. They were trying to find out whether the remainder of his testimony was true. But is there error because the jury wants to misuse an appropriate argument? This is one where I'm reading the argument. The government said, look, his testimony changed. It wasn't the same. It wasn't what he told the FBI when he was arrested. He didn't say, no, she is an adult, I know it. He didn't say that. What he said was essentially what you said. And that discrepancy is a story made up on the stand, the prosecutor says, and you shouldn't believe it. Based on the record, isn't it? No. On the record, the only thing he admitted that he didn't tell the police was I thought she was an adult woman. Yeah. But he didn't say he didn't bring in another fact. He didn't say here's another fact I'd like you to consider that you haven't heard at trial. He said there's a discrepancy based on his testimony between what he told the police and what he's claiming now. What the prosecutor said, that the government argued that Mr. Freya's testimony lacks completely in credibility. See, it looked like the jury was following his defense. It made sense. Actually, his defense made sense, and they were following it. And the only thing that they were thinking in their mind, well, what is it that the prosecutor knows that wasn't in the evidence? Okay. All right. Thank you. You're welcome. May it please the Court. Good morning. Assistant U.S. Attorney Greg Lesser on behalf of the United States. Did you try this case? I did, Your Honor. And you made this comment? I did, Your Honor. Was it supported by the record? I sure thought it was, Your Honor. Tell us real quickly why it was supported by the record. Your Honor, the defendant made three admissions that the appellant has focused on, and the three real admissions that he said that basically sunk him in the case were, one, that he did not tell the FBI when he was arrested that he thought he was chatting with an adult woman. He admitted that. And what he did tell the FBI was exactly what Judge Hurwitz and you pointed out, Judge Pius, which is that you never know how old the person is you're chatting with. And then I asked him, what he is saying on the stand now is different than what you told the FBI when you were arrested, isn't it? And he said, yes. Because what he was saying on the stand now is, I thought she was an adult. Yeah, I was surprised. The testimony he came in and he said, you know, I actually anticipated a difficult trial. I anticipated that he would come in and say, look, I never really knew, consistent with what he said to the FBI. And that would have been a difficult case to prove because if he was consistent, it's not illegal to chat with someone and entice someone who you don't know how old they are over the Internet to travel for illegal sexual conduct. It is if you believe affirmatively and you have the specific intent that that person is a minor. So if he had been consistent, this would have been a difficult case, a difficult trial. But he wasn't. He came in with a story on the stand of, oh, I knew from the get-go I was talking to an adult female. I was stumped. And then when we drew out the distinction at the end, he admitted, yeah, that's not what I told the FBI. And what he told the FBI came in through his testimony rather than through the testimony of somebody else. Correct. I did not introduce the recorded statements. It was the only thing that came in was with these admissions. And I believe that when I argued it, when the government argued it, we just argued what was in the record, what had come out of the defendant's own mouth. Let me ask you another question, which I found. Counsel didn't address this one, but the issue she briefed heavily in her brief at the outset, which was the district judge's approach to qualifying the veneer for making sure that they wanted to stay on, wouldn't try to get off the panel. And he says, I'm going to shame the jurors. What? Nobody said anything to him. If you want to get off the panel, it shows that you're un-American. Un-American. Why didn't you guys, I mean, I shouldn't say you guys. That's too colloquial. But why wouldn't you say, hey, Judge, you know, maybe, you know. Don't say that, Judge. Nobody objected, but why didn't one side or the other say, Judge, you know. I think that's a little too far. Well, we understood, I think, the defense and I, and I certainly can say I understood, that what Judge Wright was doing was trying to prevent specious claims of hardship. And it was limited to hardship. Yeah, we understand that. Counsel didn't, I mean, she raised the issue, but. And, yes, it is a relatively aggressive way, I think. And probably I would not have chosen the same wording were I on the bench. Well, that's the way he is. Yeah, he's a little bit informal. But to be honest, Your Honor, when it came down, when the remark came out, the un-American remark, it really was, and I think you can read this in the record. I didn't really illustrate this well in my brief. But really it was a tongue-in-cheek, facetious remark to sort of, you know, let people know, don't be trying to get out of jury service for nothing. Did anybody raise a hardship at that point? Yeah, actually. And, in fact, I didn't put this in the brief. I didn't even realize it until later. But actually there was one woman who approached, and it's in the ER. I can give you the site. But basically she came up and said to Sidebar, after being invited, you know, look, if you've got a serious issue, come up at Sidebar and we can discuss it. She revealed to us that she was pregnant, had morning sickness, and was concerned about her ability to, you know, be a competent juror. By stipulation, the defense and we stipulated that she could be excused for cause. So, I mean, I think that is a hardship. I didn't think of it first when I wrote the brief, but that's a hardship excuse. So even hardship excuses, they were not intimidated from, the jury panel was not intimidated from bringing them. And not only that, but you can tell that it was a little bit tongue-in-cheek because just several lines after Judge Wright made the un-American comment, he went on to say, now we're going to haul you up into the box and ask you really difficult questions like your name, your occupation. I mean, it's clear he's being a little bit facetious during this process. So, you know, choice of words, not so great on the cold record, but there's a reason why nobody objected. There's a reason why the defense and we didn't object. And the reason why we're under a plain error standard. Because at the time, I mean, you can tell from the fact there's no objection, from his other sort of facetious comments, what the tone of it is. I think he's a former drill instructor in the Marine Corps. He is, he is a former Marine. He has the Marine flag up in the corner of his courtroom. But I, you know, I can go on about this, but then I think, unless you have any questions, that's pretty much all I have. I asked that question because I, you know, I, I, Mr. Patterson and I were both long time, you know, district court judges for a long time, state court judges, and I just can't imagine using the term un-American to prospect a juror. Yeah, it was certainly not the best choice of words. He was probably, probably joking. Some way to get their attention. But... I mean, he does it, I actually think he did it in sort of an informal way to sort of disarm him too. So, I, I mean, I think that the important thing to look at is that the totality of the voir dire, if you look at it, people raise issues, people are excused for cause. He invites them to raise issues over and over. And the one woman says, I cannot, two women actually, I cannot be fair. And so they were both excused for cause. I mean, it did not prevent this defendant from having an impartial jury. Refresh my memory, my recollection. What prompted this call initially from the defendant to the undercover police officer? The physical, the phone call? Yeah. There were two phone calls made. And the defendant asked the purported 13-year-old girl, Lauren, who was actually the FBI agent, hey, can I call you? And then the, well, you understand, Your Honor, they were, they were communicating online at first. What? They were in a chat room. Yeah, they were in a chat room, right? Yeah, yeah. And they, during the, and then what they did was they switched from the chat room being a public chat room to the private chats, just one-on-one to each other. And then during those chats, the defendant asked, hey, can I call you? And then they set up a telephone call. In fact, they had two telephone calls that took place during the course of their, I think, three-week-long chat back and forth. So those were initiated by the defense. I mean, sorry, by the defendant who, you know, said, hey, can I call you? So that went, so government agents listen in on these chat calls. Well, actually what happened was the government agent was posing as the 13-year-old girl in the chat room. So when the defendant was sending chats back and forth talking about sexual matters, he was actually talking to an FBI agent who the defendant believed and was convicted of believing he was a 13-year-old girl. But it was actually the FBI agent. And, in fact, when they did the phone calls, Your Honor, what they had to do was the FBI used this device. It's a voice modulator. So it made the agent's voice sound like that of a teenage girl, of a young girl. So the agent's actually talking to the defendant on the other end of the line, and this box that they have at FBI makes his voice sound like a 13-year-old girl. And that's how they conducted the investigation. Is that a newly developed device? Well, I don't know, actually, Your Honor. That's beyond my expertise. I think they've been around for a while. I mean, I heard it. We tested it. And we actually had to make an exemplar for trial, and it seemed to work pretty well. I don't know how long they've been around, though, Your Honor. Well, do you think that's un-American? I don't think anything about this trial is un-American, especially the prosecutor. All right. Thank you. Anything further? Thank you. Your Honors, the statement that the judge made to the jury, I didn't take it as a joke at all. The jury just came into the courtroom. They were brand new there. And the judge looks at them and asks them whether or not serving on this jury would be a tremendous hardship. And then he says, So here's the part where you get to raise your hand in front of God and everybody and admit you are totally un-American. I believe that affected certain people. No one raised their hand, by the way, at that point. I mean, who would? But you either. No, the defendant didn't say, Judge, please don't say that. That's a bad thing to say. Again, I wasn't there, but you were. No, obviously, I mean you being collectively the defendant. Correct. And the problem with this kind of issue is it's impossible to know how that statement did affect the jury. And if it affected just one single juror, that's enough to constitute error. And I thought it was a very harsh statement that really chilled some of the jurors from coming forth with questions. Along the way, though, he did say if anybody can't serve or can't be fair, tell me. I want to know. I used to have jurors tell me, Judge, if I have to sit here for ten days or five days and miss work, not be able to take my kids to work, to school, I'm just not going to be fair to anybody. You know, that's the point, Your Honor. That's exactly right. And so there was nothing. He was inviting people. He invited people, and he had made that comment, which was unnecessary. But he ultimately said, is there any reason why you can't be fair? When he made this comment, no one said a thing. I mean, no one said anything. Well, they're sitting in an audience out there. But he's asking them to respond. He's asking them, this is your chance to let me know. And then he says, look, well, no one's raising their hand, so there's no issue here. I mean, judges do it a different way. I mean, when I used to do it, they'd come into the courtroom, and after everybody was sworn, and I'd ask them, do you – I'd tell the juror, the trial's going to last four days, five days, ten days. Is this going to be a hardship for anybody? They'd raise their hand, and I'd say, you come up to the sidebar and tell me what your story is, because I didn't want other jurors to know what the story was going to be that would allow them to get off the jury. So there's different ways you can do it. And he was just trying to say, look, you're going to – we need you. He may have used – he could have used better words. To be accused of being un-American and standing in front of God, I think it was very serious, just to certain type of jurors. Now, later on, during – later on, during the court of lawyer, some jurors did stand up and say, well, I've got this issue with a pregnant lady, some other issues. But I – but based on the record, I feel that there's – there had to have been some jurors that were totally chilled by that comment that wouldn't say a thing about how this would be a hardship on them. It could be doctor's appointments, taking care of parents, children in school, and it would have weighed on their mind and not be able to judge the case fairly. And that was the point of this issue. Okay. Thank you. Okay. Thank you.
judges: Pregerson, Paez, Hurwitz